THOMAS, Judge.
On February 4, 1983, Richard Dennis Stover (“the father”) and Sabrina W. Sto-ver (“the mother”) were married. There are two children of the marriage. On February 5, 2012, the father informed the mother that he had been engaged in a adulterous relationship with Sophia Clem-mons for over three years. The parties separated in March 2012, and, on September 5, 2012, the father filed in the Morgan Circuit Court a complaint seeking a divorce from the mother. At the time the father’s complaint was filed, the parties’ older child was an adult; however, their younger child was 17 years old. After the separation the older child resided with the father; the younger child, who suffers from a severe form of Glucose Transporter Type 1 Deficiency Syndrome, resided with the mother.
According to the father’s complaint, the parties’ relationship had deteriorated to the point that they could not communicate. The father asserted that the mother had engaged in domestic violence against him, had cursed at him in the younger child’s presence, had filed a false protection-from-abuse petition against him, and had harassed him by telephone and by text messages.[1] The father requested a divorce from the mother, an award of custody of the younger child, an order requiring the mother to attend a series of parenting *856 classes, an award of child support, and a division of the assets and debts of the marriage.
On September 18,2012, the mother filed an answer to the father’s complaint, denying his allegations and asserting that the father was at fault for the breakdown of the marriage. She filed a counterclaim seeking a divorce from' the father, in which she , alleged that he had physically and ■emotionally abused her during the marriage, that he had harassed her by telephone and by “text” messages, and that he was not capable of caring for the younger child.. The mother requested custody of the younger child, an award of child support, an award of alimony, a division of the assets and debts of the marriage, and an award of attorney fees. The father filed a answer to the mother’s counterclaim.
On January 9, 2013, the father filed a motion seeking pendente lite custody of the younger child. He asserted that the mother had “periodically” exhibited “irrational” or “physically combative” behaviors toward him during custody exchanges. The father asserted that, although the parties had relocated the custody exchanges to the police station, the mother’s behavior had not improved. Furthermore, according to the father, the mother’s protection-from-abuse action had been, dismissed bp-cause the mother had failed to appear at the hearing on the matter.
The mother filed a response to the father’s motion, asserting that she was the younger child’s primary caregiver and again asserting that the father was not capable of exercising custody of the younger child. According the mother, she had agreed to “dismiss” the protection-from-abüse action because the father had convinced her that if she had pursued the action he could lose his job and, therefore, the younger child’s insurance coverage. The mother requested a finding of contempt against the father because, she said, the father had continued to harass and antagonize her. The father denied that he had harassed the mother.
The divorce trial was held on September 3 through 4, 2013, and on September 12, 2013; however, the circuit court had not entered a judgment on December 20, 2013, when the father filed a second motion seeking custody of the younger child, alleging that employees of the younger child’s school had observed unexplained bruising on the younger child’s legs four or five times since August 2013. The father attached the affidavits of Mary Hillis, the assistant principal of the younger child’s school, and Sheila Lindsey, an aide at the younger child’s school. Hillis and Lindsey each testified that when she was asked how she got the bruises, the younger child had cried and stated: “Mommy hurt.”
The mother filed a response the father’s motion in which she denied that she had caused the younger child’s bruises. She asserted that the younger child’s mobility issues regularly caused her to bump into objects and suffer bruises. Furthermore, she asserted that the younger child did not speak in two-word' sentences and that the younger child referred to her as “muh” and never as “mommy.” On February 18, 2014, the mother filed a report in the circuit court, which indicated that the Lawrence County Department of Human Resources (“DHR”) had investigated the father’s allegation against her and that DHR had returned a finding of “No merit.”
On February 20, 2014, the circuit court entered the divorce judgment, which it amended that same day to correct a clerical error. The circuit court, in pertinent part, divorced the parties and awarded the parties joint custody' of the younger child. It ordered the father to pay the mother $125 in child support, and it declined to award alimony to the mother. It also de- *857 dined to award the mother any portion of the father’s retirement account with Great-West Retirement Services (“the Great-West retirement account”) upon its finding that the mother had failed to provide proof of the present value of the Great-West retirement account as of the date the father filed the divorce complaint.
On March 7, 2014, the mother filed a motion to alter, amend, or vacate the judgment, and she filed a notice of appeal on March 26, 2014. The notice of appeal was held in abeyance until the mother’s po'st-judgment motion was denied by operation of law. See Rule 4(a)(5), Ala. R.App. P. On appeal, the mother seeks our review of the following aspects of the circuit court’s judgment: the award of joint custody of the younger child, the calculation of child support, the refusal to award the mother any portion of the Great-West retirement account, the refusal to award alimony to the mother, and the division of property.

Joint Custody of the Younger Child

“Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child. Id.. In any case in which the court makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court’s judgment based on those findings is correct, and. it-will reverse that judgment only if it is found to be plainly and palpably wrong. Ex parte Perkins, 646 So.2d 46 (Ala.1994). The presumption of correctness accorded the trial court’s judgment entered after the court has heard evidence presented ore tenus is especially strong in a child-custody case. Id.”
Ex parte Byars, 794 So.2d 345, 347 (Ala. 2001).
The father testified that the younger child was born on April 11, 1995, with “special needs,” although the specific disorder was not officially diagnosed until 2007. The father said that the mother had traveled to five states and to China seeking a diagnosis and treatment for the younger child and that he had stayed at home .with the older child. It was undisputed that by 2003 the mother was not employed and that she was receiving a monthly Social Security disability benefit for her diagnosis of ankylosing spondylitis. The father admitted that the mother was the younger child’s primary caregiver and that he was the family’s “primary earner.”
The father testified that the mother would curse and berate him at custody éxchanges and that she would throw the younger child’s food and clothing, which made the younger child cry. The older child said that the custody exchanges were “awkward yelling- match[es] about nothing”; she faulted the mother for failing to focus on the younger child.' The mother agreed that the custody exchanges were hostile, but, according to her, the father made her lose her temper by repeatedly whispering “dirty words” or attempting to run over her with' his truck. The father said that he had begged the mother to stop using “sexually graphic words” to describe his commission of adultery in the younger child’s presence but that she had refused. The older child said that the younger child did not'understand the concept of adultery and that the younger child cried at custody exchanges. . The father said that the older child had begun meeting the mother for custody exchanges.
The mother said that the father had physically abused and intimidated her on several occasions. She alleged that the father had raped her; she said that he had straddled her chest and grabbed her hair and that he had forced her to perform oral *858 sex when he learned of a $40,000 debt the mother had concealed from him during the marriage. The mother said that she had never reported the alleged physical, verbal, or sexual abuse to the police because she did not want the father to lose his job and the “excellent, excellent health insurance” for the younger child.
Kenneth Tannyhill, the parties’ counsel- or, testified that he had met with the parties seven times to provide marriage counseling after the mother had learned that the father had committed adultery. He said that the parties had made attempts to save the marriage but that it was clear to him that the parties needed “long-term therapy.” He said that the father had “adjustment disorder with mixed emotional features,” which, according to Tannyhill, is a common, short-term mental illness that was treatable with therapy. Tannyhill said that he was not asked to diagnose the mother but that he had observed “very problematic” angry outbursts, although he later defined her “angry outbursts” as a display of moderate agitation or annoyance. He said that the mother had “difficulty letting go of her anger and resentment toward [Clem-mons].” The mother agreed. She saidr “Oh, yeah, yeah. I mean I — I truly loved him, and I trusted him, and he betrayed it all. ,.. And I couldn’t — I couldn’t forgive him for giving [Clemmons] what I should have had. And it wasn’t fixable.” Tanny-hill concluded that the mother was depressed because she cried and because she told him that she took a prescription antidepressant. He said that the mother suffered from a borderline personality disorder. Although the mother freely admitted that she was depressed, she testified that she had never been diagnosed with a personality disorder.
According to both the older child and the mother, their relationship was strained. The mother said that the older child had “aligned” with the father and that they had kept secrets from her. The older child testified that, in the past, the mother had verbally and physically abused her “a lot.” 'The older child testified:
“Mom never hit [the younger child] the way she hit me, but [the younger child] — and [the younger child] can make anyone frustrated sometimes, but mom would get to the point where she wouldn’t actually hit her, but she would grit her teeth and be screaming at [the younger child] and say she wants to — T just want to kill you sometimes.’ And not that she — I know she wouldn’t kill her. I know she wouldn’t do that. But she didn’t have patience with [the younger child].”
The mother denied that she had ever physically abused either child. The older child conceded that the mother had taken good care of the younger child before the parties’ separation; however, according to the older child, after the separation the mother had not properly eared for the younger child’s teeth and hair. Karen Sport, a teacher’s aide who had assisted the younger child in 2008 and 2009, characterized herself as the mother’s friend. She said that she and her daughter currently spent time with the younger child and the mother. She testified that the mother took good care of the younger child’s hygiene and that the mother helped the younger child reach her potential on a daily basis. Sport refused to say anything negative about the father because, she said, she had agreed to testify only to “protect [her] friend, who is a very capable and loving mother.”
The older child testified that the father and the younger child had a playful relationship and that the younger child laughed when she was with the father. The older child said that she shared the *859 responsibility of caring for the younger child with the father but that the father was capable of caring for the younger child and that the younger child preferred for the father, rather than the older child, to help her.
At the close of the second day of the divorce trial, the circuit-court judge instructed the father to take custody of the younger child for one week. At the start of the final day of the divorce trial, the circuit-court judge questioned the father about the custodial week. The father said that the week had been “great.” The mother said that the younger child had been happy to see her at the end of the week, but, she said,' the week had 'gone “well.”
The father, insisted that he was currently capable of caring for the younger child, that he knew her doctors, and that he was comfortable with the demands of her medicinal diet. He admitted that, like other fathers of special-needs daughters, he had found that caring for a female in her teen years was “awkward”; however, he said: “[Y]ou get over that and go on.” The father said that he depended on help from the older child and from a nurse to care for the younger child. The father said that four nights per week a nurse would “take care of the feeding, the bathing, and cleaning her room[,] and stuff like that.”
The mother testified that she was the better custodian; she said:
“I need to have custody of [the younger child] to see that her needs are met. This morning she got up, she had soiled her pullup. I was able to clean her. It is not anything I like to do. But I’m a female. I’m her momma. And I cleaned her bottom since she was born, you know. I don’t think a man should be responsible for that. And I don’t think my older daughter should be [the younger childj’s caregiver.”
The father testified that he was the better custodian; he said:
“I don’t have fits of anger toward my child, I don’t have outbursts, I don’t— I’m more active outside with [the younger child]. I have her outside doing things, such as riding her bike, swimming, horseback riding, just out more, out doing more, and she gets to be around hér sister.”
The father emphasized the mother’s'alleged temper, an allegation that the mother denied; the mother emphasized the father’s alleged inability to provide proper care for the younger child, an allegation that the father denied. Factual determinations based on conflicting evidence are within the sound discretion of the trial court. See C.B.B. v. J.S.D., 831 So.2d 620, 622 (Ala.Civ.App.2002). “Appellate courts do.not sit in judgment of disputed evidence that was presented ore tenus. before the trial court in a custody hearing.” Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). This court is not permitted to reweigh the evidence on appeal. or to substitute its judgment for that of the trial court. See Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997).
In this case, the circuit court was presented with two parents who love and support the younger child and who were each seeking an award of custody of the younger child. Our state favors joint custody, when appropriate, as a means to foster “frequent and continuing contact with parents who have shown the ability to act in the best interest of their children.” § 30-3-150, Ala.Code 1975. Based upon the evidence presented, we cannot conclude that the circuit court erred to reversal by awarding joint legal and physical custody of the younger child to the parties.

Child Support

The mother argues that the circuit court erred in its calculation of child *860 support because the father, who was 54 years old, “voluntarily retired” and “diminished his income.” The mother urges this court to require the circuit court to impute an annual income of $45,000 to the father, which was 'his income before he retired. In essence, the mother argues that the father was voluntarily underemployed. The determination whether an individual is voluntarily underemployed “is to be made from the facts presented according to the judicial discretion of the trial court-.” Winfrey v. Winfrey, 602 So.2d 904, 905 (Ala. Civ.App.1992), citing Doyle v. Doyle, 579 So.2d 651 (Ala.Civ.App.1991).
In this case, the testimony presented would not support a determination that the circuit court abused its 'discretion by its apparent determination that the father’s retirement was not an act of voluntary underemployment. Although the father was 54 years old at the time of the divorce trial, he testified that he had retired from his employment as a correctional officer at the Limestone Correctional Facility in April 2013 after 28 years of employment.
The circuit’court’s CS-42 form was included in the record. The father indicated a gross monthly retirement income of $2,994, and the mother indicated a gross monthly disability income of $1,799.[2] The father testified that he paid $361 per month for family health insurance, which covered the younger child’s medical expenses. The circuit court ordered the father to pay the mother child support in the amount of $125 per month. The Comment .to Rule 32, Ala. R. Jud. Admin, (as amended to conform to amendments to the rule effective October 4,1993), states:
“The Alabama child support guidelines do not specifically address the problem of establishing a support order in joint legal custody situations. Such a situation may be considered by the court ás a reason for deviating from the guidelines in appropriate situations, particularly if physical custody is jointly shared by the parents_ When a shared physical custody situation results in a support award that deviates from the award that would result from application of the guidelines, the trial court’s order, or the written agreement of the parties, must specify and explain the reason for the deviation.”
The circuit court’s judgment specifically notes that the circuit court intentionally deviated from the award that would result from an application of the child-support guidelines, and the circuit court properly specified that the reasons for the deviation were the award of joint custody, the award of “equal custodial time,” and the father’s obligation to provide the younger child’s health insurance. Therefore, we conclude that the mother failed to demonstrate that the father was voluntarily underemployed or that a deviation from the Rule 32 child-support guidelines in this case was improper.
*861 The Great-West Retirement Account[3]
The mother argues that the circuit court erred by concluding that she had failed to provide proof of the present value of the Great-West retirement account.
“In general, this court has held that the failure to establish the present value of the retirement benefits at issue precludes an award of a portion of those benefits under § 30-2-51(b)[, Ala.Code 1975]. , . . .
“In Wilson v. Wilson, 941 So.2d 967 (Ala.Civ.App.2005); Applegate v. Applegate, 863 So.2d 1123 (Ala. Civ. App.2003); and McAlpine v. McAlpine, 865 So.2d 438, 440 (Ala.Civ.App. 2002), this court held that, in order to support an award to one spouse of a portion of the other spouse’s retirement benefits pursuant to § 30-2-51(b), the spouse seeking such an award must introduce evidence establishing the “present value” of the retirement benefits. Moreover, this court stated that “‘[t]he failure to present the necessary evidence of the present valuation of retirement benefits ... prevents the trial court’from exercising its .'.. discretion to award one spouse any portion of the retirement benefits of the other spouse. McAlpine v. McAlpine, 865 So.2d 438 (Ala.Civ.App.2002).’” Wilson, 941 So.2d at 970 (quoting Applegate, 863 So.2d at 1124).’
“Brattmiller v. Brattmiller, 975 So.2d 359, 362 (Ala.Civ.App.2007).”
Powe v. Powe, 48 So.3d 635, 637 (Ala.Civ. App.2009).
In this case, the circuit court’s judgment reads, in pertinent part:
“4. RETIREMENT ACCOUNTS:
“The [mother] has no retirement accounts to be divided.
“The [father] has a [Great-West retirement account]. Section 30-2-51(b), Alabama Code 1975[,] states that the Court ‘may include in the estate of either spouse the-present valite of any future or current retirement benefits] that a spouse'may have- a vested interest in or may be receiving on the date the action for divorce is filed, provided that the following conditions are met:
“‘(1) The parties have been married for a period of 10 years during which the retirement was being accumulated. ■
“ ‘(2) The court shall not- include' in the estate the value of any retirement benefits acquired prior to the marriage, including any interest or appreciation of the.benefits.
‘“(3) The total amount of the retirement benefits payable to the non-covered spouse shall not exceed 50 percent of the retirement benefits that may be considered by the court.’ (emphasis added)
“Here, the parties testified that they were married on February 4, 1983, and that, the [father] worked for the State of Alabama for approximately 28 years, during a portion of which he placed funds into this account. The parties were married for a period of at least 10 years during which the retirement funds were being accumulated, and none of the retirement benefits , were acquired prior to the marriage of the parties.
*862 “The [father] provided a statement which tended to indicate that the value of the Great-West [retirement] account was $44,652.53 on December 31, 2012[,] and $45,4[32].46 on March 31, 2013. However, the law is clear that the spouse seeking an award of a portion of the other spouse’s retirement benefits pursuant to § 30-2-51(b) must introduce evidence establishing the present value of the retirement benefits as of the date the action for divorce was filed. The failure to present the necessary evidence of the present valuation of retirement benefits prevents the Court from exercising its discretion to award one spouse any portion of the retirement benefits of the other spouse. Brattmiller v. Brattmiller, 975 So.2d 359 [ (Ala.Civ.App. 2007) ], quoting McAlpine v. McAlpine, 865 So.2d 438 [ (Ala.Civ.App.2002) ] (emphasis added). No evidence regarding the present value of the Great-West retirement account as of the date of the filing of this action was presented by the [mother]. Accordingly, her request for an award of a portion of that account is denied.”
The record contains a copy of the father’s Great-West retirement account “deferred compensation plan” form (“the Great-West document”) that the father offered into evidence, which indicated an account balance of $44,652.53 on December 31, 2012, and a balance of $45,432.46 on March 31, 2013. The father testified that he was willing to divide the Great-West retirement account. He clarified: “I don’t want to, but I realize I have to. And so, yes, I will give her half of it.” On cross-examination, the father said that he presently had access to the funds in the Great-West retirement account, although he would pay a tax penalty if he withdrew the funds. He agreed that it was a divisible account and that it currently contained “$45,800.” The mother did not dispute the father’s testimony regarding the amount in the account, and she requested an award of 50% of the funds in the Great-West retirement account. Therefore there was no dispute regarding the value of the account, and there was an agreement that the mother was entitled to an award of a portion of the account; however, the circuit court concluded as a matter of law that the Great-West retirement account was not subject to division because of the mother’s failure to prove its “present value as of the date the action for divorce was filed.” Thus the question before this court becomes whether the circuit court improperly required proof of the present value of the account on the date the divorce complaint was filed.
As we explained in Robicheaux v. Robicheaux, 731 So.2d 1222, 1224 (Ala.Civ.App. 1998), § 30-2-51(b) “does not indicate when the present value of the retirement benefits is to be determined.” The statute provides that a court may include in the estate of either spouse: (1) the present value of any future retirement benefits, (2) the current retirement benefits that a spouse may have a vested interest in, or (3) the current retirement benefits that a spouse may be receiving “on the date the action for divorce is filed.” An award of a future retirement benefit does not require evidence demonstrating its present value “on the date the action for divorce is filed.”
Because the undisputed evidence indicated that the present value of the Great>-West retirement account was $45,800, the circuit court erred as a matter of law by determining that the mother failed to prove the present value of the Great-West retirement account and by determining that the mother was, for that stated reason, necessarily entitled to no portion of the Great-West retirement account. The judgment as to that issue is reversed. The cause is remanded for the circuit court to reconsider whether to *863 award the mother an equitable portion of the Great-West retirement account.
We pretermit consideration of the merits of the mother’s remaining issues regarding the correctness of the circuit court’s judgment regarding property division and alimony, because we are reversing the circuit court’s judgment as to its division of the Great-West retirement account. As we noted in Spuhl v. Spuhl, 99 So.3d 339, 342 (Ala.Civ.App.2012), “ ‘ “[mjatters of alimony and property division are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either of those issues.” ’ ” (Quoting Kreitzberg v. Kreitzberg, 80 So.3d 925, 933 (Ala.Civ.App.2011), quoting in turn Henderson v. Henderson, 800 So.2d 595, 597 (Ala.Civ.App.2000)). On remand, the circuit court is instructed to reconsider the equities and to make an equitable division of the parties’ property.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.

. The record contains a plea agreement dated June 20, 2013, in which the mother pleaded guilty in the Trinity Municipal Court to the criminal offense of harassing communications. According to the father, he received from the mother "30 to 40 [harassing] phone calls each day” and numerous "text” messages. The municipal court sentenced the mother to two years’ probation and required her to attend licensed counseling. At the time of the divorce trial, the criminal action was pending appeal in the circuit court.

. The mother testified- that she ’ received a monthly disability benefit of $1,148 and that the younger child received a monthly disability benefit of $651. The circuit court’s judgment indicates uncertainly regarding the younger child’s disability benefit.' It reads: “[The younger child] draws $651.00 per month in Social Security Disability, presumably due to either her mother’s disability or her own disability, though it was not clear from the testimony to which her check is attributed.” The circuit court specifically relied on this court’s opinion in State ex rel. J.W. v. R.D.R., 766 So.2d 854 (Ala.Civ.App.2000), for its conclusion that a noncustodial parent is not entitled to credit for Social Security payments received by a child due .to another person’s disability. Of course, in this case, due to &e award of joint custody, nei&er parent is a "noncustodial parent.” Regardless, the mother has presented no argument on appeal regarding the younger child’s disability benefit.

. The father has two retirement accounts. The father offered a copy of his current state-retirement-benefit statement into evidence, which indicated that he currently received a net income of $2,168 after he paid $36l for the family’s insurance.' The mother makes no argument on appeal indicating that she seeks a division of the father’s state-retirement benefit. "When an appellant fails to properly argue an issue, .that issue is waived and will not be considered -on appeal.” Sullivan v. Alfa Mut. Ins. Co., 656 So.2d 1233, 1233 (Ala.Civ.App.1995), citing Boshell v. Keith, 418 So.2d 89 (Ala.1982).